# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

                                      **NOTICE OF MOTION**

        -vs-

TYRONE PENNICK,

                           Defendant.        17-CR-0015A

PLEASE TAKE NOTICE, that the defendant, upon the Indictment and all prior papers and proceedings had herein, moves this Court for an order vacating the judgment and dismissing the indictment on the grounds of outrageous government misconduct or, in the alternative, an order directing a hearing and discovery relative to that issue.

Dated: November 14, 2019

                                    s/Donald M. Thompson
                                    **DONALD M. THOMPSON, ESQ.**
                                    Attorney for TYRONE PENNICK
                                    16 West Main Street, Suite 243
                                    Rochester, New York 14614
                                    (585) 423-8290

To:

Clerk, United States District Court         **JAMES P. KENNEDY, JR., ESQ.**
Western District of New York              United States Attorney
2 Niagara Square                          138 Delaware Avenue
Buffalo, New York 14202                Buffalo, New York 14202
                                     Attn.: **JOEL VIOLANTE, ESQ.**
                                             **LAURA HIGGINS, ESQ.**

# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

    -vs-

TYRONE PENNICK,

                          Defendant.        17-CR-0015A

Defendant supplements his previously-filed Rule 33 motion with the allegations and arguments set forth below in support of an order vacating the verdict in this case and dismissing the indictment, based on outrageous government misconduct resulting in violations of due process sufficiently egregious as to bar the entry of a conviction. If the Court does not grant this motion on papers, defendant requests that the Court order that a hearing, more fully discussed below, be held to further develop the facts upon which this motion is based.

In support of this motion defendant incorporates by reference the allegations and arguments in his reply memorandum to the government's response to his post-trial Rule 29 and 33 motion as well as the chronology of events as previously detailed in that reply memorandum. Further, defendant will supplement this motion with the transcript of the trial testimony of Donnell Cherry, when the same is available.

2

## Claim of Outrageous Government Misconduct

Defendant contends, based on the chronology of the events leading to his arrest as detailed in his reply memorandum and as supplemented below as well as the grand jury and trial testimony of Donnell Cherry that the government failed to supply Jencks Act and/or *Brady* material relating to the trial testimony of its witnesses; that the government represented that there was a single confidential informant (who was not Mr. Cherry) who provided information utilized when applying for the search warrant for the defendant's residence and vehicle; and that the government improperly permitted Mr. Cherry to misrepresent before the jury the extent and duration of his cooperation relating to its investigation of the defendant and his activities.

As noted in defendant's reply memorandum, on November 5, 2016, a confidential informant allegedly advised detectives that the defendant was distributing kilo quantities of cocaine (Govt. Exhibit 1 [Imiolo report]).  The confidential informant was obviously not Donnell Cherry, who was not cooperating with the government until at earliest, five days later – November 10, 2016 – when, according to the trial proof, his two properties were searched pursuant to a warrant obtained by the Erie County Sheriff's Office (ECSO) and he was arrested.

The warrant that was issued for Mr. Cherry's properties dated November 10, 2016, followed an application prepared by ECSO Detective Adam Imiolo and relied, in part on

information provided to New York State Supreme Court Justice Timothy Drury by a confidential source. The warrant applicant, use of information provided by a confidential source, and issuing magistrate are all identical to the issuance of the search warrant for the defendant's residence.

According to the proof at trial, after Mr. Cherry's properties were searched, he was transported to the ECSO station and questioned for 5-6 hours by Detectives Imiolo, Granville and others.

When questioned at trial by defense counsel, Mr. Cherry claimed that, although questioned by detectives about the source of the cocaine seized during the search of his properties, he did not name the defendant as his source. However, questioned by the prosecutor on redirect examination, Mr. Cherry claimed that he *did* identify the defendant during that initial meeting as the source of the drugs that were seized. Conversely, when he testified before the grand jury on June 1, 2017, Mr. Cherry testified that he did *not* provide any information about the defendant during his initial meeting with law enforcement on November 10, 2016. When the prosecutor asked Mr. Cherry at the grand jury "It's not until you came and cooperated here that you started giving information about Tyrone, correct?" Mr. Cherry responded "Yes." (Govt. Exhibit 3511A, p. 35).

Mr. Cherry went on to testify before the grand jury that although the person later identified by the government as the confidential source (hereafter "CS") who provided

information to the issuing magistrate in support of the application for the search warrant for

the defendant's home claimed "on the street" that after Cherry's properties were searched he

immediately began snitching on the defendant, that was not true (*id.*).

Mr. Cherry also testified before the grand jury that "them boys . . . I'm figuring them

boys was [CS] and [the defendant]" had a $20,000 contract on his head (id.).

According to the application for the search warrant for the defendant's home, on

November 11, 2016, a confidential source identified a picture of the defendant.  This

confidential source could have been Mr. Cherry, who had been arrested the day before.

However, according to the government (which has claimed that Mr. Cherry was not the

confidential source relating to this warrant application) and according to Mr. Cherry (who

testified that he was not cooperating against the defendant at that time), Mr. Cherry was not

the person referred to who identified the defendant's photograph.

Upon information and belief, the CS for defendant's search warrant was not the same

confidential source who identified defendant's picture on November 11, 2016 since, upon

information and belief, CS's residence in the Town Garden Apartments in Buffalo was not

searched pursuant to a search warrant until November 12 or 13, 2016, *after* a different

confidential source identified defendant's picture on November 11, 2016, but before CS was

cooperating with the government.

The Court will recall that the defendant requested and obtained from the Court authorization for Rule 17 subpoenas to be served on the Buffalo Police Department, Buffalo City Court Clerk's Office and Erie County Sheriff's Office, in an effort to obtain any warrants, reports, arrest or other records relative to the search of CS's residence but has received no records in response to those subpoenas.

Defendant has not been supplied with the search warrant, application, or any other supporting documentation relative to the search of CS's residence.  However, if the process was consistent with each of the other warrants supplied relating to this investigation, an application authored by Detective Imiolo and submitted to an issuing magistrate – likely Justice Drury – and supported by the testimony of a confidential source, resulting in the issuance of the warrant for CS's residence.

This chronology explains why Mr. Cherry would speculate, in his grand jury testimony, that the defendant and CS had put out a hit on him; Mr. Cherry was aware that he was the confidential source that provided information leading to the search of CS's home and that he also provided information (early on, contrary to his claim at that grand jury) with respect to the defendant, two people who he feared, based upon his cooperation with the government, would wish him ill.

The government has made clear that the confidential source referred to in the warrant application for defendant's home was shot 6 times which clearly, could not be Mr. Cherry,

who has not been shot at all.  Based upon that information, however, the defendant and the government are obviously aware of the identity of CS was Mr. Cherry, who believed that CS was one of the people who put out a hit on him.

The issue of whether, with the government's knowledge, Mr. Cherry intentionally represented to the trial jury the information of whether he had or had not immediately begun cooperating against the defendant could be easily resolved by the production of any notes, reports, or video recording of Mr. Cherry's post-arrest interview which to date, have not been provided.  The government has contended that no such materials exist, a claim that strains the bounds of credulity.

By way of example, when the codefendant was arrested by the some agency and officers just seven days later in the course of the same investigation, her interrogation was videotaped from start to finish and multiple reports were generated relative to that interrogation and the follow-up investigation, including a consensual search of her residence and seizure of her property.

Based on the above, it is now clear that more than one confidential source contributed information in support of the application for the search warrant for defendant's home, although the warrant application makes is appear as though there is only a single confidential source.

Thus, to the extent that Mr. Cherry, for example, identified a photograph of the defendant in support of the warrant application for defendant's home, or supplied information relating to the defendant whether in support of that warrant or the warrant for CS's home, whether during his initial interrogation by law enforcement or at any time prior to his grand jury testimony, such information would clearly constitute Jencks Act material and potentially *Brady* material as well, insofar as it could be used to impeach either Mr. Cherry's testimony or that of the law enforcement officers that testified at trial.

In *United States v. Russell*, 411 U.S. 423 [1973], the Supreme Court observed that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction" (*id*. 411 U.S. at 431-32).

The Second Circuit has long recognized that outrageous governmental investigative conduct may in an extreme case require invalidation of a conviction on due process grounds "if the government violates a protected right of the defendant" and "if the government's conduct reach[ed] a demonstrable level of outrageousness" (*United States v. Cuervelo*, 949 F.2d 559, 565 [2nd Cir. 1991] quoting *Hampton v. United States*, 425 U.S. 484, 495 n.7 [Powell, J. concurring]; *see also, United States v. Myers*, 692 F.2d 823 [2nd Cir. 1982] *cert. denied*, 461 U.S. 961 [1983]).

"[T]o obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting her" (*United States v. Cuervelo*, 949 F.2d 559, 565 [2nd Cir. 1991]). "The paradigm examples of conscience-shocking conduct are egregious invasions of individuals rights" (*United States v. Rahman*, 189 F.3d 88, 131 [2nd Cir. 1999]; *see also United States v. Al Kassar*, 660 F.3d 108, 121 [2nd Cir. 2011]).

In this District, Judge Larimer noted in *United States v. Miceli*, 774 F.Supp. 760, 769-70 [W.D.N.Y. 1991] that "[t]here are circumstances where government conduct in its investigation of a crime may be so outrageous as to require reversal of a conviction" (quoting *Hampton v. United States*, 425 U.S. 484, 491–95 [1976] [Powell, J., concurring]; *United States v. Alexandro*, 675 F.2d 34, 39–40 [2nd Cir.1982]; *Archer v. Commissioner of Correction*, 646 F.2d 44, 46–47 [2nd Cir.], *cert. denied*, 454 U.S. 851 [1981]; *United States v. Nunez–Rios*, 622 F.2d 1093, 1097–98 [2nd Cir. 1980]).

Judge Larimer went on to note that "the contexts in which the due process defense has received regular treatment are in the so-called sting operations" (*id., see e.g. United States v. Moore*, 916 F.2d 1131 [6th Cir. 1990] [government mail order business allowed in child pornography prosecution]; *United States v. Jacobsen*, 916 F.2d 467 [8th Cir.1990] [same]; *United States v. Asencio*, 873 F.2d 639, 640-41 [2nd Cir.1989] [undercover sale of large

quantities of narcotics upheld, but leaving open whether such an operation involving user quantities only would be upheld]; *United States v. Zambrano*, 776 F.2d 1091, 1098-99 [2nd Cir. 1985] [government complicity in counterfeit credit card operation]; *United States v. Alexandro*, 675 F.2d 34, 39-40 [2nd Cir. 1982], *cert. denied* 459 U.S. 835 [1982]).  In sting operation cases, at least, the burden of establishing outrageous investigatory conduct is heavy, in light of the "deference to the government's choice of investigatory methods" *Rahman*, 189 F.3d at 131 (citations omitted); *see also United States v. Dyke*, 718 F.3d 1282, 1285-89 [10th Cir. 2013] [describing development and critiques of the outrageous government conduct defense]; *United States v. Sabri*, 973 F. Supp. 134, 146 [W.D.N.Y. 1996]).  Outrageous government misconduct claims have not been limited to sting operations, however.

In *Midia v. United States*, 2017 WL 66713 [W.D.N.Y. 2017], Judge Skretny recognized that "[p]etitioner's claim of violation of due process due to sexual harassment by a federal agent is best considered under the umbrella of outrageous government conduct. The outrageous government conduct defense is based upon violations of the Due Process Clause of the Fifth Amendment to the United States Constitution" (citing and quoting *United States v. Russell*, *supra* at 431 [the Court, "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"]).

Judge Skretny held that "[t]o obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting her" (*United States v. Cuervelo*, 949 F.2d 559, 565 [2nd Cir. 1991]).

Outrageous government conduct is not precisely definable (*United States v. Bogart*, 783 F.2d 1428, 1435 [9th Cir. 1986]).  It is, however, typified by fundamentally unfair conduct that offends a universal sense of justice (*United States v. Russell, supra*) and generally must be "egregious" to the point of "shocking the conscience" Alexandro, 675 F.2d at 40; *United States v. Asencio*, 873 F.2d 639, 640-41 [2nd Cir. 1989] ["would have to reach a demonstrable level of outrageousness before it could bar conviction," quoting *Hampton v. United States*, 425 U.S. at 495]; *see also United States v. Zambrano*, 776 F.2d 1091, 1098 [2nd Cir. 1985]; *United States v. Roland*, 748 F.2d 1321, 1326 [2nd Cir. 1984]; *United States v. Duggan*, 743 F.2d 59, 84-85 [2nd Cir.1984]).  Such misconduct violates due process, which protects against convictions on the basis of evidence that has a high risk of being false (*see Matthews v. Eldridge*, 424 U.S. 319 [1976]).

Dismissal of the indictment is the proper remedy to address outrageous government conduct (*Greene v. United States*, 454 F.2d 783 [9th Cir. 1971]; *United States v. Bogart, supra*, 783 F.2d at 1432).

If the requested relief is not granted on papers, ordering a hearing is appropriate and

encouraged by the Second Circuit (*United States v. Cuervelo*, 949 F.2d 559 [2nd Cir. 1991]).

As that Court held:

> A motion to dismiss an indictment alleging outrageous government misconduct is a question of law directed to the trial judge and review of rulings thereon is *de novo* . . . Clearly, such a review is facilitated when a hearing on the issues presented has been held by a district court and a record has been constituted. *See United States v. Nunez-Rios*, 622 F.2d 1093, 1098 [2nd Cir. 1980]; *see also United States v. Myers*, 527 F.Supp. 1206, 1216 [E.D.N.Y. 1981], *aff'd*, 692 F.2d 823, 839 [2nd Cir. 1982], *cert. denied*, 461 U.S. 961 [1983]. It cannot be gainsaid that myriad facts and circumstances can arise in the complex context of what is commonly frequent and close interaction among government agents, witnesses and prospective defendants. A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government, as the court undertakes to sort through the various conflicting claims, and permits factual determinations to be made by the district judge. A hearing also provides the district judge with an opportunity to observe the demeanor and assess the credibility of various witnesses. Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist.

*Id.* at 567 [other citations omitted].

In *Cuervelo*, the Second Circuit held the appeal and remanded the case to the district

court with direction to hold an evidentiary hearing to develop the record with respect to the

defendant's motion (*id.* at 568).

In this case, there is no effective means short of a hearing to achieve the goal of

sufficiently developing the record relating to the defendant's motion. Prior attempts at

subpoenas failed to produce any information although, as defendant argues below, such

information should or does exist.  The only way to supplement facts to permit a full record

is by taking testimony from the law enforcement witnesses to the events in question

(although law enforcement witness testified at trial, the issues raised in this motion were not

a proper subject for their trial testimony and consequently, were not developed at trial).

Defendant further seeks an order directing that discovery be provided in preparation

for such hearing, which may, if provided, resolve the issues raised and obviate the need for

a hearing to further develop the facts.  Specifically, the defendant requests the following:

- In its text order following defendant's Rule 29 and 33 motions (Dkt. 106), the Court directed that the government's response to defendant's motions:

  shall include an updated and current showing of any basis for maintaining the confidentiality of the in camera testimony before the state court judge who authorized the search warrant for the 489 Emerson Drive residence, whether that testimony should now be disclosed or partially disclosed to the defendant, or to counsel for the defendant subject to a protective order, in light of the applicable standards for disclosure . . .

  The Court further directed that:

  [a]ny confidential portion of the submission regarding a remaining need for confidentiality of the in camera testimony may be filed ex parte and under seal, but the United States shall also address those issues in the public response to the motion in order to give the defendant a reasonable opportunity to reply . . . . The reply of the defendant shall address the sufficiency of any publicly filed showing made by the United States that the in camera testimony should remain confidential in the context of the present motion and whether in camera review of that testimony by this Court may as a matter of law be sufficient if the Court properly finds on-going confidentiality of the testimony is necessary.

The government filed its response on November 8, 2018 (Dkt. 106), which did not include the information directed to be furnished by the Court's text order. Defendant reasserts his request for the release of pretrial testimony, statements, notes and recordings of the confidential informant made support of the warrant issued for 489 Emerson Drive, whether the undisclosed information was provided by Donnell Cherry or a person the government has identified in its prior responses as a different confidential informant, who allegedly offered testimony in support of the warrant.  In addition, defendant requests:

● To the extent covered by the Court's text order, defendant reasserts his request for probation documentation or information regarding the electronic monitoring of the defendant provided to or obtained by the Erie County Sheriff's Office as well as any StingRay reports, results or information relating to that residence or the defendant's cell phone obtained prior to the search warrant application for 489 Emerson Drive;

● Detective Imiolo's notes, reports or memorializations of statements to magistrates or otherwise in support of warrants for residences occupied or used by Donnell Cherry, CS, and Tyrone Pennick insofar as those statements describe or relate to the defendant's alleged possession or distribution of controlled substances;

● Statements or information in any form whatsoever provided by Mr. Cherry, CS, the other confidential source(s) who contributed information in support of the warrants for Cherry's, CS's, or defendant's home, or any other witnesses who provided information that is or could be inconsistent with the trial testimony of Mr. Cherry or the law enforcement witnesses at trial;

● Notes or other recordings of any statements maintained by the magistrate judge that issued search warrants for residences occupied or used by Donnell Cherry, CS, and Tyrone Pennick made in support of the application for such warrants insofar as those statements describe or relate to the defendant's alleged possession or distribution of controlled substances;

● Recordings or notes of Donnell Cherry's approximately six-hour interrogation by Erie County Sheriff's detectives following the execution of search warrants at his properties on November 10, 2016 (similar to those obtained during the

14

questioning of the codefendant in this case by the Erie County Sheriff's Office following her arrest, just days later);

● All other previously undisclosed information referred to or relied upon by informants or law enforcement officers, specifically but not limited to Detectives Imiolo and Granville relating to defendant's alleged possession or distribution of controlled substances and offered in support of applications for search warrants, whether for property or vehicles associated with the defendant or others.

All of the materials described above constitute Jencks Act material for each of the witnesses named above who testified at trial and further, would constitute *Brady* material insofar as the information could be used for impeachment of any of those witnesses or reveal facts inconsistent with the government's theory of prosecution.

Again, as noted in defendant's reply memorandum, concerning the government's claim of an on-going need for confidentiality of the information submitted in support of the search warrant for defendant's home, in *Roviaro v. United States*, 353 U.S. 53, 60-61 [1957], the Supreme Court held that

> [w]here the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [informant's] privilege must give way . . . In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. . . . [W]here enforcement of a non-disclosure policy deprives an accused of a fair trial it must either be relaxed or the prosecution must be foregone. The Government is fully aware of this dilemma and solves it every day by foregoing prosecutions in many cases where evidence essential to the defense would require disclosure.

The Court explained that "no fixed rule with respect to disclosure is justifiable" (*id*. at 62); rather what is required is "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense" and whether non-disclosure is erroneous "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors" (*id*.; *see, Rugendorf v. United States*, 376 U.S. 528, 534-35 [1964]; *United States v. Lilla*, 699 F.2d 99, 105 [2nd Cir. 1983]; *United States v. Ortega*, 471 F.2d 1350, 1359 [2nd Cir. 1972], *cert. den*., 411 U.S. 948 [1973]).

Here, there is no means, short of the disclosure of the information requested, for the defendant to effectively present his claims of Jencks Act and/or *Brady* violations relating to prior statements of trial witnesses, that were made in the course of the investigation, including but not limited to those statements made in support of the search warrants for CS's and the defendant's residences and vehicles.

WHEREFORE, defendant requests that this Court grant the relief requested above.

Dated: November 14, 2019

s/Donald M. Thompson<br>
DONALD M. THOMPSON, ESQ.<br>
Attorney for TYRONE PENNICK

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2019, I electronically filed the foregoing **Notice of Motion** with the Clerk of the District Court using the CM/ECF system, which would then electronically notify the CM/ECF participants as counsel of record in this case.

s/Donald M. Thompson
Donald M. Thompson, Esq.
Attorney for the Defendant
