UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

**DECISION AND ORDER**
17-CR-15-A

TYRONE PENNICK,
                          Defendant.

The defendant, Tyrone Pennick, is awaiting sentencing after having been

convicted by a jury of three drug-related offenses.  After the parties failed to resolve

certain sentencing-related disputes, the Court held a *Fatico*[1] hearing during which

five witnesses testified over parts of two days.  The hearing primarily concerned

whether alleged drug trafficking by defendant Pennick in 2006 through 2009 was

"part of the same course of conduct," U.S.S.G. § 1B1.3(a)(2), as the much more

recent offense conduct in this case.  If so, the defendant's relevant drug-quantity

calculation and criminal history score under the Sentencing Guidelines must reflect

any earlier conduct that was proven during the hearing.  The hearing also addressed

the applicability of some upward adjustments to defendant's offense level under the

Guidelines.

The Court assumes the parties' familiarity with the prior proceedings in this

case and in a dismissed case against defendant Pennick at docket number 10-CR-

191-A, the evidence presented during the hearing, and the issues that have been

---

[1] *United States v. Fatico,* 603 F.2d 1053 (2d Cir. 1979).

raised.  After due consideration, the Court finds that the evidence introduced during the *Fatico* hearing was insufficient to prove by a preponderance of the evidence that the earlier alleged drug trafficking by the defendant was part of an ongoing series of offenses and single course of conduct.  The earlier proven conduct is therefore not "relevant conduct" in this case as that term is defined in Guidelines § 1B1.3 and will not be counted in calculating the defendant's base offense level or criminal history category.

At this time, the Court does not consider an alternative request of the United States for an upward departure to a higher criminal history category pursuant to Guidelines § 4A1.3 on the ground that the defendant's criminal history category substantially under-represents the seriousness of his criminal record and the likelihood that he will commit other crimes.  That request is unripe until the Court has the information required to determine the defendant's total adjusted offense level and criminal history category.  For similar reasons, the Court does not address an alternative request for an upward variance.  Finally, the Court addresses whether the United States has established that certain upward adjustments under the Guidelines are applicable.

## DISCUSSION

**Drug-Quantity Relevant Conduct.**  On October 17, 2018, defendant Pennick was convicted of three drug-related offenses after a four-day jury trial.  He was convicted of one Count of conspiracy to possess with intent to distribute, and to distribute, more than 500 grams of cocaine in violation of 21 U.S.C. § 846; one

2

Count of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; and one Count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1).

The evidence at trial showed that law enforcement officers executed a search warrant at the defendant's residence on November 17, 2016 and seized a kilo-sized drug press, $49,990 in cash, a digital scale, and other drug-trafficking paraphernalia. At the time, the defendant was being electronically monitored on home incarceration as a condition of federal pretrial release in his related case.

Just before the search warrant was executed, two kilogram-sized bricks of cocaine were seized from a tote bag of a friend of the defendant's, Geneva Smith, shortly after she drove away from the defendant's residence. She had stopped there for about ten minutes and picked up the bag. Some of her clothes were also in the bag.

The evidence showed that Smith picked up the two bricks of cocaine, weighing a total of nearly two kilograms, from the defendant at his residence. The defendant was convicted of possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2, on the day these two kilograms of cocaine were seized. Because possessing the two kilograms with intent to distribute them is conduct that the defendant committed, he is accountable for the conduct pursuant to Guidelines § 1B.3(a)(1)(A).

After the defendant was arrested, he was told by a law enforcement officer that a significant amount of money had been found during the search of his residence.  The defendant responded that it is not illegal to keep a large sum of money and said that the money came from the IRS.  The defendant then mentioned something about a clothing line.  The $49,990 in cash was vacuum sealed in plastic and was found inside a dishwasher.

The trial testimony of a cooperating witness, Donnell Cherry, was admitted into evidence during the *Fatico* hearing.  Cherry testified credibly about cocaine transactions he had with the defendant in the four or five months prior to the defendant's arrest, including that the defendant delivered multi-ounce quantities of cocaine on certain days of the week that corresponded with days when defendant was authorized to leave his residence by the terms of his pretrial release.  Cherry was purchasing from the defendant for himself and acted as a middleman between the defendant and another person whom the defendant did not know and did not want to deal with face-to-face.  Dkt. No. 125, pp. 8-9[2].  Cherry was paying the defendant for the cocaine only after he and the other person sold it.  *Id.*, p. 26.

Typically, Cherry received two "Bigs," or a total of nine ounces of cocaine, from the defendant.  He first received only one Big.  Dkt. No. 125, p. 25.  The price was $5,500.  *Id.* at pp. 29-30.  He received two Bigs priced at $11,000 three or four times.  *Id.*, pp. 23, 29.  Then, just before the defendant's arrest, Cherry received three Bigs for $16,000.  *Id.*, pp. 6-9, 31.  Based upon this testimony, the Court

---

[2] Citations to page numbers are to CM-ECF page numbers.

concludes Cherry purchased between 36 and 45 ounces of cocaine, or a total of at least one kilogram, from the defendant in the months before the defendant's arrest. These sales of cocaine by the defendant were relevant conduct because they were within the scope of the conspiracy to possess with intent to distribute, and to distribute, charged in Count 1 of the Indictment, were in furtherance of the conspiracy, and were certainly foreseeable in connection with the conspiracy. U.S.S.G. § 1B.3(a)(1)(B).  Alternatively, they were part of the same course of conduct or a common scheme or plan as the offenses of conviction.  U.S.S.G. § 1B.3(a)(2).

During the trial, FBI Special Agent Mark Schirching testified that $49,000 was the equivalent cost of approximately two kilograms of cocaine at the November 2016, prevailing price kilogram.  Based upon this credible evidence, the Court could infer that the $49,000 that was vacuum sealed and hidden in the dishwasher of the defendant's residence equate to another two kilograms of cocaine.

Defendant Pennick was charging Donnell Cherry $5,500 per Big, or 4.5 ounces of cocaine.  That price equates to proceeds of approximately $43,000 for each kilogram of cocaine the defendant sold.  His possession of a kilo-press used to form powder cocaine into bricks, and of the other drug-trafficking paraphernalia seized from his residence, tends to corroborate that the defendant was dealing in kilogram quantities.  Based upon this more conservative assessment of the evidence, the Court infers that the $49,000 that was vacuum sealed and hidden in the dishwasher of the defendant's residence were proceeds of drug trafficking

equating to at least another kilogram of cocaine.  *See United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008).

At this point of the analysis, the relevant drug quantity for which the defendant is accountable under the Guidelines includes approximately two kilograms seized from Smith, at least one kilogram sold to Donnell Cherry, and more than one kilogram as evidenced by the $49,000 in currency seized from the defendant's residence.  The total is approximately four kilograms.  Because this total is greater than 3.5 kilograms but less than 5 kilograms, the defendant's base offense level pursuant to Guidelines §§ 2D1.1(a)(5) and (c)(6) is at least 28.

**Earlier Alleged Conduct as Relevant Conduct.**  Defendant Pennick was arrested on December 16, 2009 on a criminal complaint charging him and 26 other persons with cocaine-related drug-trafficking offenses in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and with participating in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (a "CCE").  The criminal complaint was supported by a 281-page affidavit of a law enforcement agent.  The defendant was detained pending trial.

Approximately six and a half months later, on June 29, 2010, the defendant and nine others were indicted.  The defendant was charged in a CCE count in violation of 21 U.S.C. § 848, and in a controlled-substances conspiracy count in violation of 21 U.S.C. § 846 allegedly involving more than five kilograms of cocaine and more than 50 grams of cocaine base.  The time frame of the alleged conspiracy was about January 2007, through December 16, 2009.

6

Ten months later, defendant Pennick and 19 others were charged in a Superseding Indictment returned on May 3, 2011.  The defendant remained charged with participation in a CCE and the cocaine-related conspiracy but faced no new charges.  Of the 19 other defendants charged in the Superseding Indictment, 18 pled guilty.

On May 20, 2014, a Second Superseding Indictment was returned against only defendant Pennick.  He was charged in a CCE count and a cocaine-related conspiracy count materially the same as those in which he was charged in the Superseding Indictment.  The defendant was also charged with 11 additional counts as follows:  possession with intent to distribute cocaine in violation of  21 U.S.C. § 841(a)(1); two counts of attempted possession of cocaine with intent to distribute in violation of 21 U.S.C. § 846; one count of money laundering and one count of money-laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) and 1956(h), respectively; four counts of witness tampering in violation of 18 U.S.C. § 1512; and two counts of using a communication facility to facilitate a controlled substances offense in violation of 21 U.S.C. § 843(b).

Two counts in the Second Superseding Indictment were dismissed by this Court for a Sixth Amendment Speedy Trial Act violation.  *United States v. Pennick*, 2016 WL 4089192 (W.D.N.Y. Aug. 2, 2016), *aff'd*, 713 Fed.Appx. 33 (2d Cir. 2017). The remaining counts were dismissed upon the motion of the United States after the defendant was convicted in this case.  *See* 10-CR-191-A, Dkt. No. 1282.

During the *Fatico* hearing, the United States offered persuasive evidence of some of the drug-trafficking that gave rise to the charges in the earlier case. Rodney Hill and Sharon Jackson testified from personal knowledge based upon their participation in the conduct and conspiracy.  Transcripts of Grand Jury testimony of co-conspirators Henry Lloyd and Donetta Pride was introduced.  Their testimony was corroborated by the testimony of Special Agent Marcello Falconetti based upon his investigation that included proffers with other cooperating witnesses and the defendant.

Defendant Pennick gave information to the United States pursuant a Proffer Agreement four times in 2010.  During an interview on December 17, 2010, the defendant reported that Henry Lloyd shot a person named Rob Hogue three times in the chest with a chrome .357 caliber firearm, killing him.  The defendant said Lloyd said he did so to send a message to Kevin Hogue.

In January of 2011, after being told he had failed a polygraph examination about the Hogue murder, the defendant admitted that Lindell Johnson murdered Rob Hogue, not as he had said in December 2010, by Henry Lloyd.  The defendant said he lied because he was angry that Lloyd was cooperating in the prosecution against him.  Regardless of the motive, the defendant's admitted lie triggered the provision in his Proffer Agreement that allows use of his statements made during proffer sessions against him in this proceeding.  *See* Ex. No. 1, p. 2, ¶ 7.

The preponderance of the evidence admitted during the *Fatico* hearing established the defendant's role in potentially relevant cocaine-trafficking with

Rodney Hill that began while the defendant was on New York State parole in late 2006. They arranged seven to ten trips and obtained between five and 25 kilograms of cocaine each trip.

In early 2008, the two sought better sources of supply in Texas. Their first purchase of 34 kilograms was seized (along with three firearms that belonged to the defendant) in Louisiana from Sharon Jackson as she was transporting the cocaine to Buffalo. In February 2008, Henry Lloyd's uncle transported $500,000 to Houston, Texas, on behalf of the defendant and his co-conspirators (not including Rodney Hill) that was used to purchase 30 kilograms of cocaine that was transported back to Buffalo for sale. Later in February of 2008, co-conspirator Donnetta Pride was stopped by police in Texas and $364,000 belonging to the defendant and Henry Lloyd that had been earmarked to purchase 20 kilograms of cocaine was seized. In the summer of 2008, the defendant and Hill were involved in two transaction involving 15 and 12 kilograms of cocaine, respectively. And in 2009, approximately $340,000 that Hill had tried to mail to Houston to be used to purchase cocaine with the defendant was seized by law enforcement.

Based upon the credible evidence admitted during the *Fatico* hearing, the amount of cocaine within the scope of the conspiracy charged in the defendant's earlier case at 10-CR-191-A, or otherwise relevant conduct to that offense conduct, is conservatively well over 160 kilograms. Combined with the approximately four kilograms relevant to this case, if the earlier conduct is relevant conduct in this case, the drug quantity is well over the threshold of 150 kilograms but less that 450

kilograms that triggers a base offense level pursuant to Guidelines §§ 2D1.1(a)(5) and (c)(2) of at least 36.

On June 26, 2014, defendant Pennick was granted pretrial release in his earlier case at Docket No. 10-CR-191-A. He was on pretrial release in that case when he was arrested and charged for the conduct for which he was convicted by a jury in this case. On the theory that the only reason the defendant stopped the course of conduct from which his earlier charges in the related case arise is that the defendant was in pretrial detention, the government contends that the approximately 160 kilograms of earlier conduct and attempted conduct is "part of the same course of conduct . . . as the offense of conviction." US.S.G. § 1B1.3(a)(2).

Conduct underlying dismissed counts and adjudicated offense conduct can be considered relevant conduct as part of the same course of conduct "if they are sufficiently connected or related to [the offense of conviction] as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, comment, (n.5(B)). The Guidelines list factors that help in this determination:

> the degree of similarity of the offenses, the regularity (repetitions) of the offense, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

*Id.*; *see United States v. McCray*, No. 20-2545, 2021 WL 3196886 *5 (2d Cir. July 29, 2021). The Guidelines' concept of same course of conduct "looks to whether the defendant repeats the same type of criminal activity over time. It does not

require that the acts be 'connected together' by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable 'behavior pattern' of specified criminal activity." *McCray*, 2021 WL 3196886 *5 (quoting *United States v. Perdomo*, 927 F.2d 111, 114–15 (2d Cir. 1991).

There are certainly some similarities between defendant Pennick's drug trafficking before his arrest in December 2009, and the later conduct of which he has been convicted. His proffers disclosed numerous customers that seem roughly similar to Donnell Cherry to whom he sold cocaine that he had obtained from either Atlanta or Houston for distribution to others. But Cherry is the only customer before the Court.

There is no evidence before the Court how the defendant obtained cocaine during the 2016 criminal conduct. Before his arrest in 2009, the defendant was involved with several persons in much larger multi-kilogram purchases of cocaine from distant markets that had more pure cocaine available for less money per kilogram. The defendant would generally help arrange to have money sent or transported to Atlanta or Houston to purchase the cocaine and would arrange to have another person transport the cocaine back to Buffalo for his and his co-conspirators' processing and distribution. Although the United States argues that Geneva Smith was acting as courier for the defendant in November 2016, there is inadequate evidence before the Court to support the supposition that she was a

11

courier for the defendant[3]. In any event, there is inadequate evidence before the Court of the defendant's efforts to obtain cocaine during his later conduct for the Court to assess.

There is no evidence of the defendant doing anything while he was in pretrial detention to preserve or to perpetuate his drug trafficking activity in anticipation of his release. The defendant's proven behaviors are of cocaine trafficking, but they are not similar enough to support a conclusion that he merely put a single course of conduct "on hold" while he was incapacitated during his pretrial detention and an early portion of his home incarceration. *See, United States v. Ruiz*, 178 F.3d 877, 882 (7th Cir.1999).

Similarly, there is very limited evidence of the regularity of the defendant's drug-trafficking activity during the 2016 time period. He dealt with Cherry on a roughly monthly basis. He had two kilograms that were seized from Smith. That does not match the tempo of his earlier drug trafficking activity. The regularity of the defendant's 2016 drug trafficking may have been constrained by his home incarceration subject to electronic monitoring, but it does not match the regularity of his earlier conduct.

Finally, the time interval between the conduct is six and half years. The Court has been unable to find a single decision finding "same course of conduct" relevant

---

[3] This is addressed more fully below in the context of whether the defendant was in a supervisory role sufficient to warrant a two-level upward adjustment under Guidelines § 3B1.1(c).

conduct with a temporal gap that is this long.  The earlier conduct is simply too stale, especially given the lack of evidence of a specific behavior pattern of very similar and regular offenses during each time period.  It is true that the defendant apparently ceased drug trafficking in 2009 only because he was arrested and detained, and that he began again in or about July of 2016 only after he was granted pretrial release and remained on Court supervision.  If he had not been incapacitated, he might have continued with the course of conduct he had established before December of 2009, but that earlier conduct is not the same series of offenses as those he stands convicted in this case.  The earlier conduct is therefore not relevant conduct in this case.

**The Alternative Request for an Upward Departure.**  The United States argues that, upon a finding that defendant Pennick's drug trafficking underlying the dismissed counts in the related case is not relevant conduct in this case, the defendant's criminal history category under the Guidelines will be category III.  The defendant disputes the United States' conclusion and suggests that he will be in category II.

Ordinarily, prior criminal sentences are counted toward a defendant's criminal history category during certain time periods prior to an offense of conviction and all relevant conduct.  See U.S.S.G. § 4A1.2(e), comment. (n.8).  Accordingly, if defendant's earlier conduct underlying the dismissed counts in his related case *had* been found to be relevant conduct, older criminal sentences of the defendant's would have potentially counted toward his criminal history category even though

13

they are too old to count now.  Indeed, the United States contends the defendant would have qualified for a significantly longer sentence of imprisonment as a career offender pursuant to Guidelines §§ 4B1.1 and 4B1.2.  The defendant generally disputes the conclusion that he would have been a career offender.

The Presentence Investigation Report has not been disclosed yet, and neither party shares their analyses of the defendant's criminal record and criminal history category with the Court.  Nevertheless, the United States argues that the Court should conclude it will grant a horizontal upward departure to a higher criminal history category pursuant to Guidelines § 4A1.3 on the ground that the defendant's criminal history category will substantially under-represent the seriousness of his criminal record and the likelihood that he will commit other crimes.

A presentence investigation report summarizes all of an offender's prior criminal convictions, the conduct from which the convictions arose, the sentences that were imposed, and the offender's conduct while on post-sentence supervision, if any.  Because the Court does not yet have the Presentence Investigation Report in this case, the Court is unable adequately to determine the defendant's past criminal record.  It is therefore premature for the Court to consider a departure or variance based upon an assessment of the adequacy of the defendant's criminal history category.  Similarly, it is premature to consider the United States' arguments for an upward variance.

**The Drug-Involved Premises Upward Adjustment.**  Defendant was convicted of maintaining drug-involved premises at 489 Emerson Drive, Amherst, New York, in violation of 21 U.S.C. § 856(a)(1) as charged in Court 3 of the Indictment.  His base offense level for that offense is the same as for his drug offenses.  U.S.S.G. § 2D1.8.  The offense will be grouped with those offenses pursuant to Guidelines § 3D1.2(d) because the offense levels are "determined largely on the basis of . . . the quantity of a substance involved."  Id[4].  And a two-level upward adjustment for drug-involved premises would apply under Guidelines § 2D1.1(b)(12) if the defendant maintained the "premises for the purpose of manufacturing or distributing a controlled substance."  Id.

The 489 Emerson Drive premises were primarily the defendant's residence.  Although he frequently hosted other persons, some of whom had their own keys and were free to come and go, he was usually confined to the premises subject to electronic monitoring as a condition of his release.  He had more than a sufficient degree of control over the premises to be found to have maintained the premises under 2D1.1(b)(12).

The evidence before the Court also establishes that the 489 Emerson Drive premises were maintained to process, store and distribute drugs.  Geneva Smith received the approximately two kilograms of cocaine that were seized from her on

---

[4]  The lists of various base-offense guidelines for offenses to be grouped at § 3D1.2(d) do not include § 2D1.8 that applies to a violation of 21 U.S.C. § 856(a)(1) but, given the facts of the case and the applicable offense characteristics and adjustments that the Court concludes apply, grouping is warranted.

November 17, 2016, at that address.  The defendant supplied Donnell Cherry with lesser amounts of cocaine from those premises for at least a period of months.  The defendant's confinement to 489 Emerson Drive subject to electronic monitoring made it difficult for him to use other locations for illegal activity.  He needed the 489 Emerson Drive premises to process, store and distribute the cocaine.

Law enforcement officers seized from 489 Emerson Drive a press used to compress powdered controlled substances into kilogram-sized bricks.  They seized $49,900 cash, vacuum-sealed in plastic, hidden inside a dishwasher in the kitchen. A digital scale was seized, along with a box of rubber gloves, a bag of disposable dust masks, and a vacuum-sealer, all items that are used to process cocaine for distribution.

To be sure, the 489 Emerson Drive premises were the defendant's lawful residence.  But because cocaine processing and distribution were also principal purposes for which he maintained the premises, the two-level upward adjustment of Guidelines § 2D1.1(b)(12) applies.

**Aggravating Role Upward Adjustments.**  The United States argues that the defendant is subject to at least a two-level upward adjustment under Guidelines § 3B1.1(c) for having been an organizer, leader, manager or supervisor of at least one other participant in his offense and relevant conduct.  To qualify for the adjustment, the defendant must have exercised some control over other another participant or played a significant role in recruiting or supervising another participant.  *See e.g., United States v. Birkin*, 366 F.3d 95, 101-02 (2d Cir. 2004).

16

The burden to prove the facts necessary to support an aggravating role upward adjustment is the United States'. *United States v. Pristell*, 941 F.3d 44, 49 (2d Cir. 2019). The Court must make "specific factual findings" to impose such a role in the offense adjustment. *Id.* at p. 50 (citing *U.S. v. Stevens*, 985 F.2d 1175, 1184 (2d Cir. 1993)).

The United States argues that defendant Pennick's murdered co-defendant, Geneva Smith, was under his supervision. It is true, as the United States stresses, that during an earlier time period relevant to his related case, the defendant claimed to employ only female couriers to take money to buy large quantities of cocaine to Houston, Texas. However, the record shows that, at other times, he also used male couriers. Based upon the evidence before the Court, the Court does not find that Smith was a courier for the defendant. She accompanied the defendant to deliver cocaine to Donnell Cherry once, but there is no evidence she made any deliveries on behalf of the defendant. On the day she was arrested with approximately two kilograms of cocaine she had just received from the defendant, Smith may have been acting as a partner of the defendant's, otherwise acting on her own behalf, or acting on behalf of someone else. There is insufficient evidence to impose the aggravating role upward adjustments sought by the United States[5].

---

[5] The Court has not considered whether the defendant exercised sufficient control over Donnell Cherry, who "middled" deals for the defendant, or anyone else, to warrant imposition of an aggravated role adjustment under Guidelines § 3B1.1 only because the United States' arguments in the context of the *Fatico* hearing focused on the participants in the conduct underlying the related case and Geneva Smith.

The United States had sought a four-level upward adjustment under Guidelines § 3B1.1(a) based upon the defendant's organizer status during the extensive conduct underlying his dismissed charges in the related case.  Because the Court finds that earlier conduct is not relevant conduct, the four-level adjustment is inapplicable.

The United States also sought an additional two-level increase for a super-aggravating role in the offense pursuant to Guidelines § 2D1.1(b)(16) for obstructing justice while also receiving an aggravating role adjustment.  It does not apply because the United States has not proven the defendant is subject to an aggravating role adjustment.  *Id.*

**The Obstruction of Justice Upward Adjustment.**  The United States argues that a two-level upward adjustment for obstruction of justice pursuant to Guidelines § 3C1.1 applies because defendant Pennick solicited the murders of a suspected informant and of his co-defendant, Geneva Smith, to prevent them from cooperating with the United States during the investigation and prosecution of this case.  The defendant opposes the upward adjustment by arguing that the sole witness who testified in support of the adjustment, Phillip Perdue, was not believable and that no evidence corroborates the testimony of Perdue that the defendant solicited that murder.

Guidelines § 3C1.1 provides for a two-level increase to an offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of

18

the instant offense." *Id.* Because "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness, Application Note 4 [to § 3C1.1] sets forth examples of the type of conduct" that qualifies for the upward adjustment, *id.* at comment. (n.4), which includes "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . or attempting to do so" and committing "conduct prohibited by obstruction of justice provisions under Title 18, United States Code (*e.g.*, 18 U.S.C. §§ 1510, 1511)." *Id.* at comment. (n.4(A) and (I)).

The obstruction of justice upward adjustment clearly covers solicitation to kill a person with the intent to prevent that person from communicating with a federal officer about a possible federal offense or from testifying in connection with federal criminal investigation or prosecution. *See e.g.*, *United States v. Joseph*, 462 Fed. Appx. 52 (2d Cir. 2012) (Summary Order) (§ 3C1.1 adjustment applied to defendant who solicited the murder of his former girlfriend to prevent her from testifying against him). The United States contends that Perdue's testimony during the *Fatico* hearing established that the defendant solicited two murders to obstruct justice in this case.

Perdue testified that in 2018 while he and defendant Pennick were both incarcerated at the Niagara County Jail, he and the defendant had multiple conversations about Perdue killing an individual known as "Big C" because the defendant had concluded that Big C was informing on him in relation to this case. Perdue also testified that the defendant solicited the murder of his co-defendant because he believed she would testify against him.

Section 873 of Title 18 makes it a federal offense to solicit or "otherwise endeavor [] to persuade" person to commit a felony that has an element of the use of physical force against a person in violation of the laws of the United States. *Id.* Killing a potential witness to prevent the witness from communicating with law enforcement or testifying in a federal investigation or prosecution is a violation of obstruction of justice provisions at 18 U.S.C. § 1512(a)(1). Accordingly, if defendant Pennick solicited or endeavored to persuade Perdue to kill a person to prevent the person from providing information about this case to law enforcement or from testifying in connection with this case, the two-level upward adjustment for obstruction of justice would apply. *See* U.S.S.G. § 3C1.1, comment. (n.4(A) and (I)).

By way of background, Perdue testified that he had known defendant Pennick for about 10 or 15 years by 2018. In about October of 2008, the defendant had been shot in what he believed was an attempted murder by a rival known as "Bishop." Perdue admits he was known to be willing to shoot people for money. And in 2009, to retaliate for the attempted murder by Bishop, Perdue testified that the defendant offered to pay Perdue $50,000 to kill Bishop. Perdue agreed.

Perdue shot Bishop multiple times, and during an exchange of gunfire, Perdue was shot in the femur. But Bishop survived the murder attempt by Perdue. And just before Bishop was to view Perdue in a line-up in connection with the shooting, Bishop was found dead and burned in the trunk of a car. Dkt. No. 151, pp. 199-200. Because the murder attempt failed, the defendant only paid Perdue $10,000 of the agreed upon $50,000 contract-killing fee.

20

Nearly ten years later, in 2018, when Perdue and the defendant were incarcerated in the Niagara County Jail together[6], the defendant told Perdue that he had spoken with the individual known as "Big C" and concluded that Big C had informed on the defendant in relation to this case. The defendant conveyed to Perdue that he wanted Perdue to kill Big C in return for money when Perdue was released from custody in about a month's time. During these conversations, the defendant and Perdue tried to determine whether Perdue knew Big C, and the defendant eventually showed Perdue a photograph of himself and others with Big C. After Perdue told the defendant that he did not recognize Big C, the negotiations stopped. No specific fee for Perdue to murder Big C was ever discussed.

The Court finds the testimony of Perdue credible. As defendant stresses, Perdue has a very serious criminal record including violent felonies. He testified during the *Fatico* hearing in the hope of lenience in connection with a pending federal Hobbes Act robbery case and other offenses. And Perdue seems to have suspected that the defendant had a role in federal law enforcement officers learning of Perdue's role in shooting Bishop in 2009. Despite these circumstances showing that Perdue had a motive to fabricate or embellish his testimony, Perdue's demeanor and the content of his testimony were generally believable.

While the defendant was exploring the possibility of using Perdue to murder Big C to keep Big C from further cooperating with the United States in relation to this

---

[6]  Perdue was in custody for an alleged probation violation, the defendant was in pretrial detention in connection with this case and his related case at docket number 10-CR-191-A.

case, no specific fee for the murder was ever mentioned, and for reasons that are were not explained during the hearing, the defendant decided not to use Perdue when it became clear that Perdue did not recognize Big C.  Although the defendant had the conditional intent to have Big C killed to stop Big C's cooperation in the investigation and prosecution of the defendant, the conversations with Perdue never reached the point that the defendant solicited or endeavored to persuade Perdue to kill Big C on his behalf.  The defendant's conversations with Perdue do not support application of the Guidelines § 3C1.1 obstruction of justice upward adjustment.

Perdue's conversations with defendant Pennick about killing Smith were different.  It started when the defendant asked Perdue if he knew about the defendant's case in which his female co-defendant had gotten caught with two kilograms of cocaine and led the police back to the defendant.  Perdue acknowledged that he had heard about the circumstances of the defendant's case, and the defendant asked Perdue if he could "get to her and [said] if so, that he would give [Perdue $]100,000."  Dkt. No. 151, pp. 186-87.  Perdue understood that the defendant wanted his co-defendant killed, and that he did not care how it was done because the defendant believed his co-defendant would testify against him and wanted Perdue to "take her down."  Id. at 187.

The Court finds the circumstances of this conversation or conversations corroborate that it was a serious and substantial solicitation.  Defendant Pennick and Perdue knew each other from experience and by reputation.  They saw each other "as criminals," and engaged in "criminal talk" while in jail together, according to

Perdue. Dkt. No. 151, p. 190. Moreover, as described above, the defendant and Perdue had similar prior dealings when, to earn $50,000 from the defendant, Perdue shot and attempted to kill "Bishop" a person the defendant believed had previously shot the defendant in an attempt to kill him. Perdue was shot in the leg and although he shot Bishop, he failed to kill him and, as a result, received only $10,000 of the agreed upon $50,000 fee from the defendant. Based upon his own experience, the defendant knew that Perdue had previously shot the defendant's rival, intending to kill him, in return for money from the defendant.

Defendant Pennick was reputed to have owned a bar, a car lot, a debt collection agency, and Maserati automobiles. *See*, Gov't Exhibit 11, pp. 33-40; Gov't Ex. 12, p. 7. Perdue did not testify that he knew how much money the defendant had, but he expressed no concern about the defendant's ability to pay him $100,000 to kill Smith.

Perdue did not agree to kill Smith in response to the defendant's offer of $100,000, but he did not refuse it, either. Perdue testified that he did not want to give the defendant any reason to mistrust him. He was afraid of how the defendant would react to a refusal of the offer and, "know[ing] how he deal[t] with people" feared the defendant would pay someone to harm him if he did not agree to commit the murder. Dkt. No. 151, p. 188. The testimony was credible, especially in light of

some of defendant's statements to law enforcement during proffer sessions when he was asked about various shootings and murders.  *See* Gov't Ex. 6[7].

Perdue clearly believed that defendant Pennick solicited him to kill Smith, in return for $100,000, intending to stop her from testifying against the defendant in this case.  And although Perdue was the only witness to testify to the defendant's solicitation of the murder, the totality of circumstances that he described during his testimony strongly corroborated that the defendant endeavored to persuade Perdue to murder Smith, and that the defendant specifically intended the murder to prevent Smith from testifying against the defendant in this case.  The Court therefore finds that the defendant attempted to obstruct and impede the administration of justice in this case and that the two-level enhancement of Guidelines § 3C1.1 applies.

**An Upward Adjustment for Committing Offenses While on Bail.**  Count 4 of the Indictment alleged that the defendant was on federal pretrial release when he committed the felony offenses charged in Counts 1 through 3 of the Indictment and was subject to imprisonment pursuant to 18 U.S.C. § 3147(1).  Section 3147(1) carries a penalty of up to ten years of imprisonment that must be consecutive to imprisonment for a felony offense committed while on pretrial release.  It has been regarded as a sentencing enhancement rather than a separate offense.  *See United States v. Confredo*, 528 F.3d 143, 153-154 (2d Cir. 2008).  It is applied pursuant to

---

[7]  The United States did not introduce evidence related to four charges in the defendant's related case that he threatened a witness' family and solicited the beating of another witness to dissuade them from communicating with federal law enforcement officers about him and testifying against him in relation to that case.  10-CR-191-A, Dkt. No. 82, Counts 8 – 11.

Guidelines § 3C1.3 as a three-level upward adjustment, and the portion of the total sentence of imprisonment that is attributable to the § 3147(1) violation is explicitly imposed to be consecutive to the term of imprisonment imposed for the underlying offense.  U.S.S.G. § 3C1.3, comment. (n.1).

The verdict sheet in this case asked the jurors unanimously to find, if they found the defendant guilty of a particular offense, whether they also found that the defendant had committed the offense while on federal pretrial release.  Dkt. No. 116. The jurors checked "Yes" for each of the three offenses they found the defendant guilty of committing.  *Id*.  The three-level upward adjustment of Guidelines § 3C1.3 plainly applies.

## CONCLUSION

Based upon the evidence during a *Fatico* hearing, and for the reasons stated above, the Court finds that defendant Pennick's relevant drug quantity for purposes of calculating his base offense level under the Sentencing Guidelines is approximately 4 kilograms.  The more than 160 kilograms of cocaine relevant to his earlier dismissed case at 10-CR-191-A was not part of the same course of conduct and is therefore not relevant conduct in this case.

The Court also finds that upward adjustments for maintaining drug premises under Guidelines § 2D1.1(b)(12), for obstruction of justice under Guidelines § 3C1.1, and for committing offenses while on pretrial release under Guidelines § 3C1.3, all apply.  The United States has not proven the applicability of an aggravating role

upward adjustment under Guidelines § 3B1.1, or the additional role adjustment in Guidelines § 2D1.1(b)(16).

Sentencing will be on September 21, 2021 at 12:30 p.m.  The parties and the United States Probation Office shall confer on the schedule for completion of the Presentence Investigation Report and the filing of sentencing submissions and may advise the Court informally if the current schedule should be adjusted.

**SO ORDERED.**

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  August ⌒ , 2021

26